Susan S. Ford, OSB No. 842203
susanf@sussmanshank.com
Thomas W. Stilley, OSB No. 883167
tstilley@sussmanshank.com
Clifford S. Davidson, OSB No. 125378
cdavidson@sussmanshank.com
SUSSMAN SHANK LLP
1000 SW Broadway, Suite 1400
Portland, OR 97205-3089
Telephone: (503) 227-1111
Facsimile: (503) 248-0130

Attorneys for plaintiff DePaul Industries

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| **DEPAUL INDUSTRIES**, an Oregon non-profit corporation, | Case No. 6:18-cv-320-MC |
| Plaintiff, | SECOND AMENDED COMPLAINT |
| v. | |
| **CITY OF EUGENE**, a municipal corporation, **JOHN RUIZ**, in his official capacity as the City Manager of the City of Eugene; **BENJAMIN MILLER**, personally and in his official capacity as Assistant City Attorney for the City of Eugene; **LAVENA NOHRENBERG**, in her official capacity as Customer Experience Manager of the City of Eugene Public Library; **CLAYTON STILWELL**, in his official capacity as Purchasing Analyst for the Finance Department of the City of Eugene; and **DOES 1-9**, unknown individuals acting under color of law, | |
| Defendants. | |

## INTRODUCTION

1.    This case concerns violations of rights guaranteed by the United States Constitution, Oregon law, and the City Code of Eugene, and the unlawful annulment by the City of Eugene (the "City") of two contracts for security services between the City and Plaintiff DePaul Industries ("DPI"), an Oregon non-profit corporation.  DPI is a "Qualified Non-Profit Agency for Individuals with Disabilities" ("QRF") as defined under ORS 279.835(5). Its mission and sole business purpose is to provide employment opportunities to persons with disabilities.[1]

2.    Public bodies in the state of Oregon, including the City, are legally required to contract with an available QRF for goods and services, prior to offering the same opportunity to a non-QRF contractor.  The legislative policy behind the QRF mandate is to assist individuals with disabilities to achieve maximum personal independence through gainful employment by assuring an expanded and constant market for sheltered work, thereby enhancing their dignity and capacity for self-support, and minimizing their need for costly institutionalization. See, ORS 279.840. Through the QRF mandate, the Legislative Assembly "intends that the department, public agencies and qualified nonprofit agencies for individuals with disabilities cooperate closely. ORS 279.850 (3).

3.    The Oregon Department of Administrative Services ("DAS") implements the QRF mandate.  It lists DPI as the only QRF provider of security services to municipalities in Lane County, Oregon.  DPI's employees are certified to provide unarmed security services.

4.    For approximately 12 consecutive years prior to the events described herein, the City contracted with DPI as a QRF for unarmed security surveillance services in eleven City-owned parking garages located in the downtown Eugene area (the "Parking Garage Contract"). For approximately 8 consecutive years, the City contracted with DPI under a separate contract

---

[1] "Disability," for purposes of employment with DPI, encompasses the same criteria as the Americans with Disabilities Act (42 USC §§ 12101-12213).

Page 1 – SECOND AMENDED COMPLAINT

for unarmed security services at the Eugene Public Library (the "Library Contract," and collectively with the Parking Garage Contract, the "DPI Contracts"). DPI's services pursuant to the DPI Contracts resulted in approximately 13 disabled persons (depending upon the City's need and the year) having stable employment.

5.    At all relevant times, DPI was available to meet the City's needs, and DPI had a legitimate claim of entitlement to, and a property interest in, the DPI Contracts and their renewal. Likewise, DPI's disabled employees had a property interest in their continued employment through the DPI Contracts.

6.    DPI employed a security guard named Mark Cosby, who was on the roster for the Parking Garage Contract.  During his non-work hours, Mr. Cosby was an outspoken citizen on matters of public concern.  He frequently attended City Council meetings and was critical of the Mayor's and the City's policies and actions.

7.    The City communicated objections to DPI on multiple occasions about Mr. Cosby's constitutionally protected conduct.  This greatly concerned Mr. Cosby's supervisor because DPI's Parking Garage Contract was up for renewal in June 2016.  Based on continued objections by the City, Mr. Cosby's supervisor eventually removed him from assignment to the Parking Garage Contract, but did not terminate his employment with DPI.

8.    Mr. Cosby subsequently filed suit against the City for violation of his First Amendment rights (the "Cosby Lawsuit").  The City Attorney's Office ("CAO"), through Assistant City Attorney, Benjamin Miller, then served a demand upon DPI to defend and indemnify the City on account of the Cosby Lawsuit.

9.    Meanwhile, DPI is informed and believes, and therefore alleges, that Lavena Nohrenberg, the Customer Experience Manager for the City's downtown public library (the "Library") and its "Security Analysis Committee" (the "SAC") had unilaterally decided to take actions that would cause the City to terminate the Library's relationship with DPI and DPI's disabled workers, because Ms. Nohrenberg and the SAC wanted "real" security guards instead.

Page 2 – SECOND AMENDED COMPLAINT

They worked with Clayton Stilwell, a Purchasing Agent in the City's Department of Finance to circumvent the QRF mandate (which might otherwise have required renewal of DPI's Library Contract) and displace DPI's security guards, without any meaningful notice or attempt to "work closely" with DPI. To implement their plan, Ms. Nohrenberg, the SAC, and Mr. Stilwell invented a new, sham requirement for "armed" security at the Library for which DAS does not list a QRF provider.  Next, they put the Library security contract up for public bidding, which resulted in a contract award to a non-QRF provider, Advanced Security Inc. ("ASI").  At all relevant times, however, Ms. Nohrenberg and the SAC never wanted armed guards at the Library, nor did they believe armed guards were necessary, and the Library does not utilize armed security to this day.

10.     After the public bidding process closed, but while the ASI contract was being drafted, the City's Parking Services department was independently preparing a renewal of DPI's Parking Garage Contract.  Prior to delivery of the contract renewal to DPI, the CAO received DPI's rejection of the City's tender of the Cosby Lawsuit. Thereafter, Benjamin Miller and the CAO, with retaliatory intent, arrogated the parking garage contract decision away from the Parking Services department, and, without any bidding process whatsoever, grafted the parking security services into the ASI contract.  DPI received no advance notice or meaningful opportunity for discussion prior to the CAO's actions.  Even ASI did not receive notice, and was surprised by its windfall.

11.     Apart from loss of stable, long-standing employment for its employees, the effect of the City's actions upon DPI was the *de facto* disqualification of DPI from any opportunity to participate in either the QRF process or the public bidding process for these City contracts.

12.     Despite well-known constitutional and statutory law and City's rules and policies, and the financial and other benefits of the DPI Contracts to the City, its taxpayers, and the disabled community of Lane County, the City impermissibly terminated the contractual relationships it had maintained with DPI over many years, to the economic damage of DPI and

Page 3 – SECOND AMENDED COMPLAINT

its employees.

## JURISDICTION AND VENUE

13.    The Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1334(b), and 1367.  At the time this case was filed, it was related to Bankruptcy Case No. 16-32293-pcm11, *In re DePaul Industries, and DePaul Services, Inc*. (the "Bankruptcy").

14.    By stipulation, because the relevant acts or omissions occurred in part in Eugene, Oregon, and because the defendants reside in this district, this Court is the proper venue and divisional assignment pursuant to 28 U.S.C. § 1391(b) and Civil LR 3-2.

## PARTIES

15.    DPI is a 501(c)(3) non-profit, public benefit company within the meaning of Oregon Revised Statutes §§ 60.750-60.770.  DPI is also a "qualified nonprofit agency for individuals with disabilities," sometimes known as a Qualified Rehabilitation Facility or QRF, within the meaning of ORS § 279.835-279.855.  DPI is incorporated in Oregon and its headquarters are located in Portland, Oregon.

16.    The City is a municipal corporation duly incorporated and authorized under the laws of the state of Oregon pursuant to ORS 221.020.  At all relevant times, the City acted by and through its employees and agents who were delegated the decision-making authority of the City Manager, and were acting within the course and scope of their employment and/or agency, ostensibly for the City's benefit.

17.    John Ruiz ("Ruiz") is the City Manager, who was acting in his official capacity, had final authority for the decisions alleged herein, and on information and belief, delegated final authority for the decisions alleged herein or ratified such decisions.  At all material times, Ruiz was acting under color of law.

18.    Benjamin Miller ("Miller"), on information and belief, is the Assistant City Attorney, who was acting both personally and in his official capacity, and was delegated authority for the City's decisions alleged herein.  At all material times, Miller was acting under

Page 4 – SECOND AMENDED COMPLAINT

color of law.

19.     Lavena Nohrenberg ("Nohrenberg"), on information and belief, is the "Customer Experience Manager" for the City of Eugene's Library" (the "Library"), who was acting in her official capacity, and was delegated authority for the City's decisions alleged herein.  At all material times, Nohrenberg was acting under color of law.

20.     Clayton Stilwell ("Stilwell"), on information and belief, is a Purchasing Analyst for City's Department of Finance (the "Stilwell") who was acting in his official capacity, and was delegated authority for the City's decisions alleged herein.  At all material times, Stilwell was acting under color of law.

21.     Does 1-9 will be identified after further discovery is completed. Upon information and belief, each such Doe defendant participated in the tortious and unlawful conduct alleged below. Based on discovery to date, DPI believes that Does 1 through 9 acted either individually, or in concert, whether intentionally or negligently, to deprive DPI of its statutory and constitutional rights as alleged below.

## COMMON ALLEGATIONS

A.     **DPI's Contractual Relationships with the City.**

22.     Effective July 1, 2012, DPI and the City executed the Parking Garage Contract, specifically Trade Services Contract (No. 2013-02024).  A copy of the Parking Garage Contract is attached as Exhibit 1.  DPI was to provide – and did provide – unarmed security surveillance services at 11 parking facilities in downtown Eugene.

23.     Paragraph 6.2 of the Parking Garage Contract provides the City may require DPI to terminate the job assignment of any employee as a result of an outstanding and unresolved objection to an employee's conduct. Paragraph 14 provides for termination of the Parking Garage Contract by written notice upon an event of default, which includes DPI's failure to perform any covenant set forth in the Parking Garage Contract.

24.     DPI had provided parking services to the City under a contract entered into prior

Page 5 – SECOND AMENDED COMPLAINT

to the 2012 Parking Garage Contract.  The parking garage contracts were renewed annually by amendment, comprising a total of approximately 12 years.  Each contract year ran from July 1 to June 30 of the following year.

25.    From July 1, 2015 to June 30, 2016, at all relevant times, approximately 6-10 DPI employees (depending upon hours needed) were employed in connection with the Parking Garage Contract, and DPI received annual payment from the City in the amount of $225,000.

26.    Effective July 1, 2003, DPI and the City executed the Library Contract, specifically Trade Services Contract (No. 2003-03861).  Pursuant to the Library Contract, DPI was to provide – and did provide – unarmed security services at the Eugene Public Library.

27.    The Library Contract was renewed annually.  Each contract year ran from July 1 to June 30 of the following year.[2]   At all relevant times, approximately 3 DPI employees provided security services pursuant to the Library Contract, and DPI received annual payment of approximately $92,000.

28.    The DPI Contracts were awarded through the City's use of the QRF Program mandated by ORS 279.835-279.855 and related DAS rules, which require government entities to use a QRF contractor listed on the DAS-approved list, as long as the QRF is available to perform the specified work.  An agency may utilize a public procurement process only if no QRF contractor is listed on the DAS procurement list that can meet the agency's needs. The Legislature has expressed its intent that public agencies work closely with QRF contractors to foster a stable and enduring relationship.

29.    DPI is the only QRF for unarmed security services in Lane County.  DPI's employees are trained to provide unarmed security services, and provided unarmed security services for the City's parking garages and the Library for all years covered by the DPI

---

[2] DPI separately contracts to provide security for the City's Municipal Court, its only remaining contract with the City.

Page 6 – SECOND AMENDED COMPLAINT

Contracts.

**B.**     **DPI Employee Mark Cosby Exercises His First Amendment Rights – to the Chagrin of the City.**

30.     At all relevant times, DPI employed a security guard named Mark Cosby, who was assigned as a security officer under the Parking Garage Contract.

31.     The City viewed Mr. Cosby as a political agitator, based upon his frequent appearances at City Council meetings, emails to City Hall and then-Mayor Kitty Piercy, and other constitutionally protected exercises of free speech and association.   From   mid-2014 through January 2016, the City communicated objections to DPI regarding Mr. Cosby's off-the-clock actions on multiple occasions, including, without limitation, the following:

a.     On or about July 23, 2014, Travis Hargitt, the City's employee in charge of administering the DPI Parking Garage Contract, sent DPI a link to a speech Cosby gave at a City Council meeting, in which he was critical of the Mayor.  The subject line of Hargitt's email stated: "For You to Do With What You Want." Cosby's supervisor viewed the email and the link to Cosby's speech.  Hargitt also spoke directly with her about the event, stating:  "He wouldn't work for me";

b.     In July 2015, Mr. Cosby witnessed a hit and run accident while on the job and provided a report to his supervisor.  In October 2015, Mr. Cosby contacted a defense attorney involved in the case because Mr. Cosby believed he should have been subpoenaed as a witness.  Hargitt subsequently alleged to Cosby's supervisor that Cosby was interfering with the City's criminal prosecution by calling the defense attorney.  He also strongly expressed the City's desire that Cosby be removed from assignment to the City Parking Garage Contract, referring to Mr. Cosby as "a fucking idiot";

c.     In October 2015, Mr. Cosby protested when President Obama visited Roseburg in the aftermath of the Umpqua Community College shooting. Eugene Mayor, Kitty Piercy, publicly welcomed President Obama at the Eugene airport prior to his trip to Roseburg.

Page 7 – SECOND AMENDED COMPLAINT

DPI is informed and believes, and on that basis alleges, that Cosby was shown on social media and television in Roseburg holding a sign reading "Obama Go Home," and that this and other political conduct resulted in Mr. Cosby being monitored by the City of Eugene Police Department ("EPD") at the request of City Officials; and

d.      On or about January 6, 2016, Hargitt emailed Cosby's supervisor regarding the Mayor's "State of Eugene" meeting, forwarding a chain of emails from EPD Officer Klinko and other City officials, originating with an email Cosby sent to the Mayor about attending the meeting, with a photo of Mr. Cosby in a T-Shirt depicting political speech pertaining to the City's decision to close public restrooms.

32.     Substantially as a result of the City's objections to DPI regarding Mr. Cosby's constitutionally protected conduct, and DPI's concerns the City could declare a default, terminate, or refuse to renew the Parking Garage Contract, and displace all of DPI's disabled security employees, Mr. Cosby's supervisor removed him from his assignment to the City parking garage roster.  However, DPI did not terminate Mr. Cosby's employment.

**C.      Cosby Sues the City; The City Tenders to DPI and DPI's Insurer.**

33.     On February 16, 2016, Mr. Cosby sued the City in the Eugene Division of the United States District Court for Oregon.  He alleged First Amendment retaliation in violation of 42 U.S.C. § 1983.  In the Cosby Lawsuit, Cosby alleged that he suffered adverse employment action as a result of the City's disapproval of his First Amendment conduct.  The Cosby Lawsuit gained media attention, including in the Eugene Register-Guard.

34.     On March 3, 2016, the CAO, through Miller, tendered the Cosby Lawsuit to DPI. The CAO demanded that DPI or its insurer pay for the City's defense of the Cosby Lawsuit and indemnify the City, purportedly pursuant to paragraph 8 of the Parking Garage Contract.

35.     DPI rejected the tender on May 31, 2016 in a letter to the CAO.  Among other reasons, DPI responded that it was not responsible for Mr. Cosby's First Amendment conduct on his own time.

Page 8 – SECOND AMENDED COMPLAINT

36.    DPI's insurer also rejected the City's tender.

**D.    The Library Pretextually Requires "Armed" Security Services to Disqualify DPI From Public Bidding, and Pursues an Unlawful Public Procurement Process For Library and Parking Garage Security Services.**

37.    Meanwhile, in or about February, 2016, the SAC, headed by Nohrenberg, began devising a plan in conjunction with other City agents in the Finance and Administration Department, to annul DPI's Library Contract with the City, circumvent the QRF mandate, and put security services out for public bid instead.  As of March 30, 2016, it was decided that "armed" security services were not necessary, but that that specification was to be inserted in a public Request for Proposal ("RFP") anyway, "in case."  The intended effect of this strategy was to dodge the QRF mandate, and debar or disqualify DPI as a bidder for library security services in any public procurement process.  The City provided no notice to DPI of its intent to do so, or any opportunity for a hearing.

38.    The SAC was apparently dissatisfied with DPI's disabled employees. Notwithstanding DPI's employees' certifications by the State of Oregon to perform unarmed security work, and the requirement that the City work closely with QRFs, the SAC decided it wanted "real" security guards who were "competent."  At no time did any City agent contact DPI about any general dissatisfaction with DPI's employees' performance or staffing—though, there were occasional complaints, as with any vendor-vendee situation. Not only did Nohrenberg not provide notice to DPI, she instructed library employees not to discuss SAC's plan with DPI security officers, and at all relevant times, the City concealed from DPI its plan to annul the Library Contract, bypass the QRF mandate, and, in effect, disqualify DPI from any opportunity to participate in a public procurement process.

39.    The SAC and Nohrenberg orchestrated their plans in collaboration with Stilwell and other City officials.  The Library Contract had never contained a requirement for armed security in all the years DPI had the contract.  Currently, there are no armed security guards

Page 9 – SECOND AMENDED COMPLAINT

patrolling the Library, and Nohrenberg and the SAC never wanted them there.

**E.**     **The DPI Parking Garage Contract is Grafted onto the City's Award of the Library Contract to a non-QRF Provider, After Close of the Public Bidding Process.**

40.     Although the City's efforts and motivations to deprive DPI of its rights and interests in the DPI Contracts appear to have begun as early as January 2016, DPI is informed and believes, and upon that basis alleges, that eventually the City's efforts came to fruition through decisions made by the City Manager's delegates in the Finance and Administration Department and the CAO, including, without limitation, Miller.

41.     On May 27, 2016, the City published its "Request For Proposal for Security Services, Solicitation No. 2016200055" (the "RFP") through the City's "E-bid" website.  The City's RFP, by its terms, covered only the Library and the Hult Center for the Performing Arts.  The Hult Center's existing non-QRF security service provider was ASI. Its guards were already certified to be armed.  The RFP required that the successful applicant supply "armed" security guards at both locations, however. Because DPI was not then certified to provide armed security services, and could not have met the requirement before closing, DPI did not submit a proposal.  The RFP also said nothing about the 11 City parking garages that DPI was then patrolling pursuant to the Parking Garage Contract.

42.     Shortly after the City posted its RFP for the Library and Hult Center, DPI's lawyer sent its response to the City's demand that DPI defend and indemnify the City against the Cosby Lawsuit, declining the City's demand.  At the same time, the City's Parking Services department and its contract managers were preparing an addendum to renew DPI's Parking Garage Contract, as had been done for the 12 years before, pursuant to the QRF mandate.  In close temporal proximity to the City's receipt of DPI's lawyer's response declining to indemnify the City in the Cosby Lawsuit, DPI is informed and believes, and on that basis alleges, that Miller, the CAO, and other City administrators removed the decision from the City's Parking Services department, and directed Hargitt, the direct contact person for DPI, to suspend his

Page 10 – SECOND AMENDED COMPLAINT

efforts to move forward with renewal of the DPI Parking Garage Contract.  On June 21, 2016, after the public RFP bidding process was already closed for the Library and Hult Center, the CAO told Hargitt that he could not contract with DPI anymore, and needed to "jump on the current RFP."

43.     On information and belief, adding services to a contract award after the RFP bidding process was closed (when such services were not identified in the scope of the RFP) was a customary practice of the City.

44.     As of the end of June 2016, DPI believed that the Parking Garage Contract would be renewed as it had been before.  Indeed, the City had not communicated any reason for DPI to believe otherwise.

45.     Shortly before June 30, 2016, after the City's unlawful procurement process for Library security was completed, the City finally told DPI the City would also no longer contract with DePaul for parking services in the City garages.

46.     The City selected ASI as the successful bidder.  The City had informed ASI of its planned RFP process for the Hult Center and Library in or about April, 2017. The City did not provide such notice to DPI.

47.     After the RFP process and protest period had lapsed, the City drafted a contract with ASI.  To DPI's astonishment, the award to ASI included not only the Library and the Hult Center—the two facilities listed in the RFP—but also all of the City's parking garages subject to the DPI Parking Garage Contract, without any public bid process whatsoever.

48.     DPI was not alone in its belief that the City's RFP did not include the Parking Garage Contract.  As has been revealed in discovery, the non-QRF companies that responded to the RFP, including ASI, believed they were responding to a proposal to provide security services only for the two facilities listed in the RFP (the Library and the Hult Center).  Even ASI was surprised by the award (the "ASI Contract").  After receiving the award, ASI expressed concern to the City that it did not have the capacity to handle the expanded scope.

Page 11 – SECOND AMENDED COMPLAINT

49.    DPI is informed and believes, and on that basis alleges that, to this day, ASI's security officers at all facilities included in the ASI Contract other than the Hult Center (including the Library and all eleven downtown City parking garages) are unarmed (other than with pepper spray, which DPI employees are certified to carry).

50.    At the conclusion of the City's RFP process, the City caused its RFP for the Library and Hult Center Security to be removed from the City's E-bid website.  However, other RFPs for previously awarded City contracts remain available for public view.

51.    The City never came out and told DPI that it was parting ways on the DPI Contracts, notwithstanding state policy requiring public agencies to work closely with QRF contractors. Instead, Defendants bypassed the QRF mandate, concocted and ratified an RFP process that essentially disqualified DPI from the Library Contract by the addition of an unnecessary requirement for "armed" security, and then deprived DPI of the Parking Garage Contract as well, in retaliation for DPI's refusal to succumb to the City's wrongful demand for contractual indemnity for the City's own conduct which deprived Mr. Cosby (DPI's employee) of his First Amendment rights.

52.    DPI is informed and believes, and on that basis alleges, that ASI is paid approximately $500,000 for performing services nearly identical to those that DPI performed at less than one-half the cost.

53.    DPI has given required notices, including any required by ORS 30.275, of its intent to pursue the claims asserted herein.

54.    To the extent any legal requirement exists, DPI has exhausted any available administrative remedies with respect to Defendants' deprivations of DPI's rights, or is excused from doing so by Defendants' conduct alleged herein.

### FIRST CLAIM FOR RELIEF

### (Violations of ORS 279.850—Against the City)

55.    DPI incorporates and realleges the foregoing paragraphs as though set forth fully

Page 12 – SECOND AMENDED COMPLAINT

herein.

56.    In 1977, the Oregon Legislature enacted ORS 279.835-279.855.  These statutes require that all state and local governments in Oregon purchase goods and services from QRFs, when the product or service is listed on a QRF Procurement List maintained by the Oregon Department of Administrative Services ("DAS"), and meets the agency's requirements.

57.    Pursuant to ORS 279.845(a), the Oregon Department of Administrative Services ("DAS") has the duty to determine the price of all services offered for sale to various public agencies by a QRF.

58.    Pursuant to ORS 279.845(2), DAS "shall establish and publish a list of sources or potential sources of products produced by any qualified nonprofit agency for individuals with disabilities and the services provided by any such agency, which [DAS] determines are suitable for procurement by public agencies . . . ." As of January 31, 2017, that list was available online at http://dasapp.oregon.gov/qrf/index.aspx (the "DAS Procurement List") and included security services.

59.    DPI is the only QRF listed to provide "unarmed security services" in Lane County.

60.     ORS 279.850(1)(a) mandates that "a public agency that intends to procure a product or service on the procurement list that the Oregon Department of Administrative Services established under ORS 279.845 shall, in accordance with the Department's rules, procure the product or service at the price the department establishes from a qualified nonprofit agency for individuals with disabilities, provided that the product or service is of the appropriate specifications and is available within the period the public agency requires."

61.    The City is a "public agency" or "public contracting agency" within the meaning of ORS 279.835(4) because the City is a political subdivision of the state of Oregon. Notwithstanding the sham specification for "armed" security added by Nohrenberg, Stilwell, and one or more of Does 1-9, DPI is informed and believes, and therefore alleges that at all relevant

Page 13 – SECOND AMENDED COMPLAINT

times, with respect to the Library and the City Parking Garages, the City intended to utilize unarmed security services, regardless of the terms of the City's RFP.  As such, the City was required to procure those services from DPI, which was available to provide them at the prices determined by DAS.

62.    The sole grounds on which the City could use an unarmed security services contractor that was not a QRF are listed in ORS 279.850(1) (b) and OAR 125-055-0005.

63.    None of the grounds listed in ORS 279.850(1)(b) or OAR 125-055-0005 existed at the time the DPI Contracts were non-renewed, and do not exist today.  At all relevant times, the security services DPI provides met the City's actual security requirements and DPI was available to meet the City's needs.

64.    The Legislature commands public agencies to "cooperate closely" with qualified nonprofit agencies for individuals with disabilities.  However, the City did not cooperate closely with DPI—opting instead to non-renew the DPI Contracts at the last minute and without explanation.  The City's pretexts of wanting "armed" security guards and all services under one common provider were a sham, as the City did not actually want armed security guards and the City did not consolidate all its security services into the RFP.

65.    By its actions and inactions with respect to the DPI Contracts, including entering into the contract with ASI, Defendants violated ORS 279.850.

66.    As a result of the City's conduct, DPI has been and will continue to be damaged in an amount according to proof at trial, but not less than:

> (a)    With respect to the Parking Garage Contract, the sum of $2,225,000—the value of the contract in 2016, times ten years (DPI, as the sole QRF in Lane County had been providing the services for 12 years before the City's sudden termination or non-renewal of the Parking Garage Contract); and

> (b)    With respect to the Library Contract, the sum of $736,000--the value of

Page 14 – SECOND AMENDED COMPLAINT

the contract in 2016, times 10 years.

In the alternative, DPI should be awarded economic damages for lost contract revenue from June 1, 2016 through the date of judgment herein, including pre-judgment interest thereon. Further, the Court should grant DPI equitable relief, in the form of reinstatement as a contractor for all services covered by the DPI Contracts for a period of not less than 8 consecutive years, at employment levels and prices not less than those in effect in 2016.  The City should also be enjoined from further violations of ORS 279.835-279.855 and OAR 125-055-0005.

## SECOND CLAIM FOR RELIEF

### (Violations of ORS Chapter 279A; Eugene Charter; Divisions 46-47 of Eugene Public Contracting Rules; Against the City)

67.    DPI incorporates and realleges the foregoing paragraphs as though set forth fully herein.

68.    In addition to the right to participate in the City's contract procurement process as a QRF, DPI also had the right to participate in the City's public procurement process.

69.    ORS 279A.015(b)(2) sets forth a policy of the state of Oregon in enacting the Public Contracting Code that a sound and responsive public contracting system should "Instill public confidence through ethical and fair dealing, honesty and good faith on the part of government officials and those who do business with the government."

70.    The Eugene Charter, Section 14, requires that "City officials shall afford even-handed consideration and treatment to all citizens."

71.    Under the Eugene City Code ("City Code"), the City Manager is the Purchasing Agent for the City and is authorized to award all City contracts, and adopt rules, regulations and procedures for contracting agencies under the Oregon Public Contracting Code.  The responsibilities and authority of the Purchasing Agent may be delegated and sub-delegated.  See, City Code § 2.1415. "Purchasing Agent" is defined as the City Manager or a designee appointed by the City Manager to exercise the authority of the Purchasing Agent under the City's public

Page 15 – SECOND AMENDED COMPLAINT

contracting functions.   A "Solicitation Agent," with respect to a particular solicitation or invitation to one or more potential contractors to submit a bid to the City with respect to a proposed contracting opportunity, means the City Manager or employee delegated responsibility for conducting the solicitation and awarding the contract.  City Code § 2.1420. DPI is informed and believes, and therefore alleges that at all relevant times, the Solicitation Agent for the City's RFP was Stilwell.

72.    With respect to security services at the Library formerly handled by DPI, the decision to add a specification for "armed" security officers to the City's RFP was a pretext and a sham, made for the purpose and with the effect of disqualifying DPI from participation in the City's procurement process due to DPI's employees' disabilities in violation of ORS 279A.015, 279B.130 and 279C.440, and Public Contracting Rules ("City Rules") 137-046-0120 and 137.047.0575.

73.    In addition, the City failed to conduct the Library security services procurement process in an open, impartial, and competitive manner.  As a result, the City's procurement of the Library security services was invalid.  See, ORS 279A.210; City Rule 137-046-0420.

74.    With respect to security services formerly provided by DPI at the City parking garages, the decisions and practices of the CAO, including, without limitation, Miller, and the City's Purchasing Agents (including delegates), to remove the contract renewal decision from the Parking Services department, and unilaterally terminate DPI's Parking Garage Contract without notice (after DPI declined the City's indemnity demand for the City's own actions against Mr. Cosby) and then graft those security services onto an award to ASI that had never been available for public bidding by anyone, was unlawful in the following respects:

(a) It had the purpose and effect of disqualifying DPI from participating in the City's public procurement, misleading DPI as to the true nature of the public contract to be issued, and deprived DPI of adequate notice or any process whatsoever in violation of ORS 279A.015, 279B.130 and 279C.440 and City Rules 137-046-

Page 16 – SECOND AMENDED COMPLAINT

0120 and 137.047.0575;

    (b)   It violated public contracting laws and rules of the State of Oregon and the City, including, without limitation, the following:

        (i)   City Rules 137-047-0110(4) and 137-047-0255(b), due to the City's failure to identify the security services for the parking garages in the scope, specifications, and need for services described in the RFP;

        (ii)   City Rules 137-047-0300-0600 et. seq., due to the City's failures to follow applicable procedures for Addenda, Offer and Acceptance, including date and time, and Award; and

        (iii)   The City's legal and ethical obligations to conduct the security procurement process in an open, impartial, and competitive manner.

75.     As a result, the City's procurement process for the security services formerly provided by DPI for the eleven City parking garages was invalid.  ORS 279A.210; City Rule 137-046-0420.

76.     In addition to a declaration that the City's process and award to ASI was invalid, DPI should be awarded its economic damages suffered as a result of Defendants' improper conduct, or in the alternative, equitable and injunctive relief as previously alleged.

### THIRD CLAIM FOR RELIEF

### (42 U.S.C. § 1983; Violation of Substantive Due Process; All Defendants)

77.     DPI incorporates and realleges the foregoing paragraphs as though set forth fully herein.

78.     As the only QRF certified to perform unarmed security services in Lane County, DPI possessed a property interest in the continued renewal of the Parking Garage Contract and the Library Contract—both of which entailed unarmed security services.

79.     Pursuant to City customs and practices, and through Defendants' acts or omissions, Defendants deprived DPI of this property interest. Defendants did so by, among other

Page 17 – SECOND AMENDED COMPLAINT

things:

    a.  Lulling DPI into not submitting a proposal in response to the RFP, as described above; and

    b.  Creating a pretext of a need for armed security in the Library, when Nohrenberg's and the City's true motive was to eliminate DPI from the Library.

80.    Defendants had no legitimate reason for depriving DPI of its property interest in renewal of the DPI Contracts. Rather, Defendants deprived DPI of its property interest in renewal of the DPI Contracts because Defendants wished to hire "real" security guards—that is, security guards who were not disabled, and in retaliation for refusing to fire Cosby or accept tender of his lawsuit.

81.    DPI should be awarded damages and other relief as permitted under 42 U.S.C. §§ 1983 and 1988 against Defendants as follows:

(a)  Damages against the City in an amount to be proven at trial, but not less than $736,000—the value of the Library Contract in 2016 multiplied by 8 years as previously alleged;

(b)  Damages against the City in an amount to be proven at trial, but not less than $2,225,000—the value of the Parking Garage Contract in 2016 multiplied by 10 years as previously alleged;

(c)  Injunctive relief restoring the DPI Contracts, or any of them, to DPI; and

(d)  DPI's reasonable attorney fees and litigation expenses incurred herein.

## FOURTH CLAIM FOR RELIEF

### (42 U.S.C. § 1983; Violation of Procedural Due Process; All Defendants)

82.    DPI incorporates and realleges the foregoing paragraphs as though set forth fully herein.

83.    Defendants denied DPI procedural due process through the following actions:

Page 18 – SECOND AMENDED COMPLAINT

(a) With respect to DPI's interests in the Library Contract, by:

(i) Failing to provide any notice to DPI of any overall issues related to its performance of the Library Contract;

(ii) Failing to provide any meaningful notice to DPI that the SAC intended to terminate the Library Contract and pursue a public bidding process to obtain a different provider of security services; and

(iii) Inserting a requirement in the RFP for "armed" security as a pretext, which automatically disqualified or debarred DPI from participation in the Library's procurement process, without placing DPI on notice and providing an opportunity to be heard on the issue of disqualification or debarment as required by Oregon law and City Rules.

(b) With respect to the Parking Garage Contract, by:

(i)     By failing to provide DPI with any meaningful notice or opportunity to be heard regarding the City's unilateral and wrongful termination of the Parking Garage Contract (after DPI declined the City's improper indemnity demand regarding the Cosby Lawsuit);

(ii)     By failing to provide DPI with any notice, opportunity to lodge a protest or to be heard that the security services DPI had been providing to the City in its 11 parking garages would be grafted after-the-fact into a contract award to ASI;

(iii)     By failing to provide DPI with any notice, opportunity to lodge a protest, or to be heard that the City intended to award a contract for downtown parking garage security that omitted any description of those services in the scope of the RFP; and

(iv)     By, in effect, taking actions that disqualified or debarred DPI from participation in the procurement process, without placing DPI on notice

Page 19 – SECOND AMENDED COMPLAINT

and providing an opportunity to be heard on the issue of disqualification or debarment as required by Oregon law and City Rules.

84.    At all relevant times, Miller, Nohrenberg, Stilwell, and Does 1-9 were acting under color of Oregon state law, the City Code, and City Rules.

85.    As a result of the City's actions, DPI should be awarded damages against the City and other relief as permitted under 42 U.S.C. §§ 1983 and 1988 in an amount to be proven at trial, but not less than:

> (c)    With respect to the Parking Garage Contract, the sum of $2,225,000—the value of the contract in 2016, times ten years (DPI, as the sole QRF in Lane County had been providing the services for 12 years before the City's sudden termination or non-renewal of the Parking Garage Contract);
>
> (d)    With respect to the Library Contract, the sum of $736,000--the value of the contract in 2016, times 10 years;
>
> (e)    Injunctive relief restoring the DPI Contracts, or any of them, to DPI; and
>
> (f)    DPI's reasonable attorney fees and litigation expenses incurred herein.

86.    In addition, DPI is informed and believes, and therefore alleges that Miller and one or more of Does 1-9 (to be identified after further discovery), acted intentionally, recklessly and with retaliatory intent to exert economic duress against DPI and ultimately deprive DPI of its property interests in the DPI Contracts on account of DPI's association with Mr. Cosby and DPI's refusal to indemnify the City for its wrongful actions taken against him on account of his constitutionally protected speech. Their conduct was intentional or in reckless disregard of DPI's rights in the DPI contracts as well as the interests of DPI's disabled employees, and violated clearly established law of which a reasonable person would have been aware. As a result, and to deter such misconduct in the future, Miller and one or more of Does 1-9 (to be identified in further discovery), should be assessed compensatory damages as alleged

Page 20 – SECOND AMENDED COMPLAINT

hereinabove and punitive damages in a total amount not less than $3.0 million.

## FIFTH CLAIM FOR RELIEF

### (42 U.S.C § 1983; First Amendment Retaliation – Against All Defendants)

87.    DPI incorporates and realleges the foregoing paragraphs as though set forth fully herein.

88.    DPI possessed a valuable property interest in the renewal of its Parking Garage Contract with the City, including the right not to have the contract imperiled or terminated, directly or indirectly, on account of DPI's legal refusal to: (a) terminate Mr. Cosby on account of the City's objections to speech and association protected by the First Amendment to the United States Constitution; or (b) agree to the City's demand for indemnification in the Cosby lawsuit, purportedly pursuant to the Parking Garage Contract, on account of the City's own efforts to deprive Mr. Cosby of his right to engage in conduct protected under the First Amendment.

89.    DPI exists for the purpose of providing employment opportunities to, and support of, those who have disabilities. A central part of DPI's mission is raising awareness of disabilities and sending a message, to persons with disabilities and the public at large, that persons with work-related disabilities are cherished and worthwhile members of society who should be supported.

90.    DPI possesses a First Amendment right to associate with Cosby in order to further DPI's mission. The exercise of that right resulted in the City's retaliation.

91.    The City's and Hargitt's improper objections to Cosby's employer about his exercise of First Amendment rights during non-working hours also affected DPI's interests due to an implied threat of future non-renewal of its Parking Garage Contract. The City, Miller, and one or more of Does 1-9 (to be identified after further discovery), ultimately made good on that threat by implementing customs and practices depriving DPI of its contract interests after DPI refused the CAO's demand that DPI pay the City for the Cosby Lawsuit.

92.    As a result of the foregoing retaliatory actions against DPI attributable to its

Page 21 – SECOND AMENDED COMPLAINT

employee's protected First Amendment conduct, DPI was deprived of its interests in the Parking Garage Contract.

93.    DPI has been damaged in an amount to be proven at trial, but not less than the amount previously alleged with respect to the Parking Garage Contract.

94.    In addition, to prevent the City from retaliatory conduct and chilling the exercise of First Amendment Rights of all persons employed by any City contractor and by the City itself, the City should be enjoined from such conduct.

95.    Miller and one or more of Does 1-9 (to be identified in further discovery), should also be assessed should be assessed compensatory damages as alleged hereinabove and punitive damages for the reasons and in the amounts previously alleged.

96.    DPI should also be awarded its reasonable attorney fees and litigation expenses incurred herein pursuant to 42 U.S.C § 1988.

## SIXTH CLAIM FOR RELIEF

### (Breach of Covenant of Good Faith and Fair Dealing; Against the City)

In the alternative to the state statutory claims, and in addition to the federal constitutional claims, DPI alleges:

97.    DPI incorporates and realleges the foregoing paragraphs as though set forth fully herein.

98.    The Library Contract and the Parking Garage Contract were valid and enforceable.

99.    The City had discretion concerning whether to renew the DPI Contracts for the next year.

100.    The City did not renew the DPI Contracts.

101.    The City's decision not to renew the Parking Garage Contract was retaliatory. The City decided not to renew based on DPI's denial of the improper tender of the Cosby Lawsuit and DPI's refusal to terminate Cosby based on his speech and assembly activities.

Page 22 – SECOND AMENDED COMPLAINT

102.    The City's decision not to renew the Library Contract was an unlawful employment action based upon disability and without regard to the City's obligations and policies under Oregon law with respect to QRF contractors and their disabled employees.

103.    The City abused its discretion, and acted in bad faith, in not renewing the DPI Contracts.  The non-renewals were each contrary to DPI's reasonable expectations that:

(a)    The City would comply with Oregon law, including ORS 279.850, concerning contracts with qualified nonprofit agencies for individuals with disabilities;

(b)    The City would make only reasonable indemnity demands upon DPI pursuant to the Indemnity Provision;

(c)    The City would not retaliate against DPI for refusing an unreasonable indemnification request; and

(d)    The City would not retaliate against DPI for one of its employee's conduct protected by the First Amendment of the Federal Constitution and Article 1, section 8 of the Oregon Constitution.

104.    DPI has performed all obligations under the DPI Contracts on its part to be performed.

105.    The City's breach of the covenant of good faith and fair dealing has damaged DPI in an amount to be proven at trial not less than the amounts previously alleged herein.

## SEVENTH CLAIM FOR RELIEF

### (Fraud—Against the City)

106.    DPI incorporates and re-alleges the foregoing paragraphs as though set forth here in full.

107.    By publishing an RFP that did not mention facilities other than the Library and Hult Center, which would require "armed" security services for all locations included in the ultimate award to ASI, and by failing to disclose the existence of these material facts to DPI in a timely manner prior to the City's decision to not terminate or not renew the DPI Contracts, the

Page 23 – SECOND AMENDED COMPLAINT

City duped DPI into not participating in, protesting, or otherwise enjoining the RFP process.

108.    Prior to and continuing through the time the City published the RFP, the City's intention was to displace DPI by awarding a contract to a public bidder and then expand the scope of the work to be performed to include unarmed security services for the Library and all the City's downtown parking lots.   This intention is evidenced by, among other things: (a) correspondence between City officials debating whether to expand the  scope immediately after issuing the contract, or whether the contract could be amended later;  (b) the temporal proximity between DePaul's refusal to accept tender of the Cosby lawsuit and the City's issuance of the RFP; (c) to this day, the security officers in the Library and Parking Garages remain unarmed— i.e., they do not carry firearms as part of their duties; (d) the fact not even ASI --the company awarded the contract pursuant to the RFP --understood the RFP to include a broader scope.

109.    The City's false representations and omissions about the scope of the RFP induced DPI not to bid, or to protest or immediately enjoin the RFP process.

110.    DPI acted reasonably in relying on the language of the RFP in not submitting a proposal.   As Lane County's sole QRF for unarmed security services, DPI could not have submitted a response requiring armed security, and the RFP referenced only two facilities that were to have "armed" guards, omitting services covered by DPI's Parking Garage contract, which were only grafted into the award to ASI after the bidding process had closed.

111.    The City damaged DPI through its intentional misrepresentations.

112.    DPI has been damaged in an amount to be proven at trial, but not less than the amounts previously alleged herein.

### EIGHTH CLAIM FOR RELIEF

### (Negligence – Against the City)

As an alternative to the First Claim for Relief:

113.    DPI incorporates and re-alleges the foregoing paragraphs as though set forth here in full.

Page 24 – SECOND AMENDED COMPLAINT

114.    The QRF statute imposes upon the City a mandatory duty to contract with QRFs, such as DPI, so long as the City procures a good or service for which there is a certified QRF available.

115.    In the QRF statute, the Legislature expressed its intent that public agencies "work closely" with QRFs in order to effectuate the QRF statute's purposes, and that to this end, public agencies are authorized to enter into contractual arrangements in order to accomplish the purposes of the QRF statute.

116.    The City breached the aforementioned duties to DePaul by (a) non-renewing the DPI Contracts, (b) engaging in a pretextual and opaque contracting process, (c) to the extent there were concerns about DPI's performance, failing to address them with DPI, and (d) to the extent the City required armed security guards or a consolidated security solution for the Hult Center and Library, entering into an arrangement whereby DPI could handle unarmed security to the greatest extent possible.

117.    As a foreseeable result of the City's failure to perform its duties, DPI has been damaged in an amount to be proven at trial, but not less than the amounts previously alleged herein.

WHEREFORE, DPI prays for relief as follows:

A. On its First, Second, Sixth, Seventh, and Eighth Claims for Relief, the sum of not less than  $2,225,000 for the Parking Garage Contract and not less than $736,000 for the Library Contract; and in the alternative, all lost contract revenue from June 1, 2016 through the date of judgment herein on each contract, including pre-judgment interest thereon, and equitable relief in the form of reinstatement to the DPI Contracts for a period of not less than 8 consecutive years, at employment levels and prices not less than those in effect in 2016; and an injunction requiring the City to comply with Oregon's QRF statute and all rules and policies of Oregon contracting law and the City Code.

Page 25 – SECOND AMENDED COMPLAINT

B.  In addition, on its Second Claim for Relief, for a declaration that the ASI Contract and the City's public procurement process was invalid with respect to the RFP.

C.  In its Third Claim for Relief, (a) damages in an amount not less than the sum of $736,000--the value of the Library Contract in 2016 multiplied by 8 years as previously alleged; and (b) DPI's reasonable attorney fees and litigation expenses incurred herein;

D.  On its Fourth Claim for Relief, (a) the sum of not less than $2,225,000 for the Parking Garage Contract and the sum of not less than $736,000 for the Library Contract; (b) DPI's reasonable attorney fees and litigation expenses incurred herein;

E.  On its Fifth Claim for Relief, (a) damages in an amount not less than the amount previously alleged with respect to the Parking Garage Contract; (b) an injunction to prevent the City from retaliation in response to First Amendment conduct of its contractors—whether entities or employees of those entities; and (c) DPI's reasonable attorney fees and litigation expenses incurred herein pursuant to 42 U.S.C § 1988;

F.  On its Fourth, and Fifth Claims for Relief, for punitive damages in the amount of $3.0 million against Miller and one or more of Does 1-9 (to be identified in further discovery);

G.  Such other and further relief as the Court may deem just and equitable.

/ / /

/ / /

/ / /

/ / /

/ / /

Page 26 – SECOND AMENDED COMPLAINT

Dated: September 24, 2018.

SUSSMAN SHANK LLP

By s/ Susan S. Ford
    Susan S. Ford, OSB No. 842203
    Thomas W. Stilley, OSB No. 883167
    Clifford S. Davidson, OSB No. 125378

    Attorneys for Plaintiff DePaul Industries

Page 27 – SECOND AMENDED COMPLAINT